**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **ELLEEN RICHARDSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-CV-452-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Elleen Richardson ("Richardson"), pursuant to 42 U.S.C. § 405(g), requests

judicial review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying his applications for disability insurance and supplemental security

income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* In accordance with 28

U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States

Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of

Appeals. Richardson appeals the decision of the Administrative Law Judge ("ALJ") and asserts

that the Commissioner erred because the ALJ incorrectly determined that Richardson was not

disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the

Commissioner's decision.

### Claimant's Background

Richardson was 49 years old at the time of the hearing before the ALJ on December 2,

2009. (R. 37). She was 5'7" and weighed 286 pounds. (R. 38). She had a high school education

and had received some vocational training from Job Corps. (R. 38). Richardson testified that

she had last worked in approximately 2002 as a certified nurse assistant, but was fired because

she no longer had transportation and was in a physical altercation with her boss.  (R. 39-40).  After losing that position, Richardson had a guidance counselor help her look for jobs, but the counselor told her that employers refused to hire her because of her attitude and her propensity for violence.  (R. 39-40).

Richardson testified that she quickly became angry by things that people said or did.  (R. 41).  She testified that being around a lot of people upset her and that she felt paranoid and believed people talked about her and stared at her.  (R. 43, 46-47).  When she became angry, she would "go blank and see red" or "blackout."  (R. 41-43).  She testified that she was afraid to go out into public because she frequently got into altercations and was afraid someone would be harmed.  (R. 43, 46-47).  Richardson testified that during her angry outbursts, she became violent and liked to "cut people up a lot, physically cut them up."  (R. 42).  She testified that she had stabbed people 10-20 different times, but did not know what she was doing.  *Id*.  She testified that she was incarcerated after one "blackout" and did not know what she had done until her daughter told her.  (R. 42-43).  She had received three years of probation and had served some jail time from a couple of the stabbing assaults.  *Id*.

Richardson testified that she had been diagnosed with bipolar disorder.  (R. 41).  In her testimony, she said she suffered from visual and auditory hallucinations.  *Id*.  Richardson testified that her mental condition had worsened over time and that her mood swings were more common and that she became violent faster.  (R. 42, 47).  She testified that it "excite[d]" her to see "guts and blood" in a "picture show."  (R. 42).  Richardson said she saw a psychiatrist once a week and took medication for her mental problems.  (R. 41-42).  Her medications caused her to have dry mouth, blurry vision, and slurred speech.  (R. 47).  Richardson testified that her doctors had told her that her aggressive behavior and her mood swings would keep her from getting a job.  (R. 47).  At the hearing, she said that she had requested, and was waiting for her doctors to

find her inpatient treatment for anger management. (R. 48).

In addition to Richardson's mental problems, she testified that she also had a tumor on her dominant right hand, diabetes, poor vision, low back and hip pain, uncontrolled high blood pressure, high cholesterol, heart problems, asthma, and was overweight. (R. 41, 43-44, 48-51). Richardson testified that she used to qualify for indigent assistance for her medications when she was homeless, but she was no longer able to get them because a friend had given her a place to stay. (R. 48, 50, 52).

Richardson testified that the tumor on her right hand caused problems with gripping, holding, and lifting things. (R. 44). Richardson testified that she could lift less than five pounds with that hand. *Id.* Richardson previously had surgery to remove the tumor, but it grew back. (R. 43-44). She took care of all of her personal grooming, but was unable to comb her hair with her right hand. (R. 44-45). She also had trouble writing and opening a car door with her right hand. (R. 44).

Richardson testified that she had excruciating pain in her hips and low back, which she attributed to a pinched nerve. (R. 48-50). She also testified that she was overweight and had gained approximately 20 pounds just four months prior to the hearing. (R. 50). Richardson believed that stress, and not over-eating, caused her to gain weight. *Id.* She further testified that she experienced shortness of breath due to her excess weight and asthma. (R. 51).

Richardson gave testimony regarding the affects of her physical and mental impairments on her life. (R. 45-54). She testified that she typically went to bed around 5 p.m., but bloody and violent nightmares usually woke her before 4 a.m. (R. 45). Richardson also testified that due to her back and hip pain, she was unable to lay on her side and had to sleep sitting up. (R. 48-49). She approximated that she could walk a block or a block-and-a-half before needing to rest and could stand for only 15-20 minutes before she had to sit or lay down to rest. (R. 49, 53).

Richardson partially attributed these difficulties to her back and hip pain, swelling in her legs from her diabetes, and difficulty breathing from her asthma and obesity. (R. 48-49, 51). She also testified that she was unable to sit for more than 20 minutes because of her back pain. (R. 49, 53). She estimated that she could pick up and carry less than five pounds with her right hand, but had the ability to handle15-20 pounds if she used both of her hands together. (R. 44, 52). She testified that she could only bend over to pick up approximately a half-gallon of milk due to back and hip pain. (R. 48).

Richardson testified that someone did her laundry because she would forget to do it herself. (R. 46). Richardson's daughter did her shopping because Richardson did not like to be around people in public. *Id.* Richardson testified that her only household chore consisted of cleaning her room, which she defined as making her bed. (R. 46, 53-54). She testified that her daughter was her only visitor and that she would occasionally help Richardson. (R. 45, 53). Richardson cooked for herself, but had difficulty using her right hand. (R. 45-46, 54). Other than her daughter and her roommate, Richardson testified that she had no activities or social life outside of her home. (R. 45, 53). Richardson testified that the hardest thing for her to do was to go outside her home. (R. 50-51).

Richardson was treated by a homeless clinic through Morton Comprehensive Health Services ("Morton") from 2004 to 2008. (R. 230-321, 372-94). Most of the records from Morton consist of hand-written notes, many of which are by illegible practitioners, and are difficult to decipher. *Id.* Richardson was treated at Morton on May 4, 2005 for night sweats, headaches and blurry vision. (R. 310-11). It was determined that Richardson had sustained a skull fracture subsequent to walking into a brick wall two weeks earlier. *Id.* Her blood pressure

was recorded at 130/90[1] and she had been out of her blood pressure medication for a week. (R. 310). Richardson was diagnosed with hypertension, headaches, and a mass on her right hand. (R. 311). She was referred to a surgeon to evaluate the mass on her hand. *Id.*

Richardson was seen for a follow-up appointment at Morton on June 8, 2005. (R. 308-09). Richardson reported that her headaches had improved but the pain in her hand was worse. (R. 308). Richardson had been out of her blood pressure medication for a week. (R. 308). Richardson was diagnosed with insulin requiring diabetes mellitus- type II, hypertension, chronic anxiety, and asthma. (R. 309). Richardson was again referred to an orthopedic clinic for treatment of her hand was given refills of her medications. *Id.*

On July 20, 2005, Richardson presented to Morton for a check-up and complained of anxiety, shaking, an increase in acid reflux, heat intolerance, and constant sweating. (R. 306-07). Richardson also reported that her pulse was up to 140 beats per minute at times. (R. 306). Her blood pressure was listed at 111/85. *Id.* It was noted that the mass in her hand was enlarged. (R. 307). In addition to her prior diagnoses of hypertension, diabetes, and chronic anxiety, Richardson was diagnosed with gastroesophageal reflux disease and persistent tachycardia[2] and was scheduled for an EKG. *Id.*

On November 2, 2005, Richardson presented to Morton with complaints of numbness, weakness, and paralysis on the left side of her body, as well as slurred speech. (R. 304-05). It was noted that Richardson had a possible cerebrovascular accident and she was sent to Hillcrest

---

[1] Normal blood pressure is in the recorded range of 120/80, which indicates systolic pressure of 120 and diastolic pressure of 80. Taber's Cyclopedic Medical Dictionary 243-44 (17th ed. 1993).

[2] Tachycardia occurs when the heart beats abnormally fast, usually over 100 beats per minute in an adult. Taber's at 1943.

Medical Center ("Hillcrest").  (R. 305).

When Richardson arrived at Hillcrest on November 2, 2005, she reported that she had been experiencing left-sided weakness for five days, an episode of paralysis, loss of balance, sweating, headaches, and blurred vision.  (R. 179-82).  Richardson reported a history of swelling in her lower extremities, and pain in her left hip, hand, and lower back. (R. 181-82).  She also said she experienced depression, anxiety, insomnia, and visual and auditory hallucinations.  *Id*. Richardson's neurologic examination revealed that her cranial nerves were intact, but confirmed weakness in her left-sided upper and lower extremities.  (R. 182).  Her admitting diagnoses indicated Richardson had hypertension, diabetes, asthma with chronic obstructive pulmonary disease, depression, tobacco use, and former alcohol abuse.  *Id*.  The results of a head CT and x-rays of her chest were normal.  (R. 179, 188-89).  Richardson was discharged on November 4, 2005, with a diagnosis of left extremity hemiparesis,[3] hypertension, and labile[4] diabetes mellitus, type II.  (R. 179).  Richardson was urged to stop smoking and instructed to resume her cardiac treatment and her diabetic diet.  *Id*.

On February 21, 2006, Richardson reported to Morton for a follow-up visit.  (R. 301-02). It was noted that she had residual left sided weakness and was not progressing.  (R. 301).  It was also noted that her asthma and diabetes were under control.  (R. 302).

Richardson continued to be seen at Morton on a regular basis through the remainder of 2006 to monitor her diabetes, hypertension, and asthma, and for other various ailments, including a persistent rash, scabies, boils, hemorrhoids, and an injury to her foot from stepping on a nail.  (R. 275-300).  On July 14, 2006, Mary Batiste, ARNP, filled out a form indicating

[3] Hemiparesis is paralysis affecting only one side of the body.  Taber's at 873.

[4] Labile indicates that it was unstable; fluctuating.  Dorland's Illustrated Medical Dictionary 952 (29th ed. 2000).

Richardson could not work for three months due to her coronary artery disease, hypertension, and diabetes. (R. 290). At an appointment on September 6, 2006, Richardson complained of pain in her left hip and left lower back when bending and moving around. (R. 284-85). At a subsequent appointment on November 14, 2006, Richardson still complained of hip pain as well as swelling in her feet. (R. 279-80). On that date, Ike Onwere, M.D., filled out another form excusing Richardson from work for three months due to her hypertension and musculoskeletal pain. (R. 278). Two weeks later, on November 28, 2006, Richardson again complained of hip pain, as well as weakness and swollen legs. (R. 276-77).

Richardson continued regular check-ups at Morton throughout 2007 to refill medications and to monitor her hypertension, asthma, diabetes, depression, and pain, as well as to treat skin and gynecological problems. (R. 253-74). On January 31, 2007, Batiste noted that Richardson had chronic hip pain with ambulating, which was making it difficult for her to work, and provided another form[5] excusing Richardson from work for three months due to her diagnoses of hypertension and musculoskeletal pain. (R. 246, 273-74). Batiste also noted that Richardson suffered from depression, but that she liked the effects of the anti-depressant, Zoloft. (R. 273-74).

On April 2, 2007, Richardson continued to complain of pain in her hips, which was aggravated by ambulating. (R. 270-71). Richardson also reported that she was having difficulty sleeping. *Id.* On June 8, 2007, Richardson complained of pain and swelling in her knees and Batiste noted that she experienced knee pain with an increase in range of motion. (R. 264-65).

On September 18, 2007, Batiste filled out a form from Tulsa Transit recommending that

---

[5] During the course of her treatment of Richardson, Batiste signed several standard forms indicating that Richardson could temporarily not work due to her various diagnoses of musculoskeletal pain, hypertension, diabetes, and asthma. (R. 245, 246, 318, 320, 380, 386).

Richardson be certified as permanently disabled in order to receive reduced fare due to her asthma and potential shortness of breath if she walked long distances. (R. 319).

At an appointment on February 19, 2008, Richardson reported worsening depression and an increase in episodes of anger. (R. 251-52, 391-92). Batiste increased the dosage of her anti-depressant, Lexapro. (R. 252). On that date, Batiste filled out a functional limitations form for the Department of Rehabilitation Services, evaluating Richardson's limitations in working an eight-hour work day. (R. 242, 385). Batiste checked that Richardson could frequently sit and grasp. *Id.* She marked that in an eight-hour work day, Richardson was able to stand occasionally, but was limited due to low back pain. *Id.* She marked that Richardson could not bend, kneel, squat, crawl, or climb. *Id.* Batiste wrote that Richardson could occasionally walk the distance of ½ block. *Id.* She found that Richardson could occasionally lift or carry no more than 15 pounds. *Id.* She wrote that Richardson's asthma prevented her from working in dusty, dry, humid, hot, or cold conditions. *Id.*

On March 10, 2008, Batiste noted that the Lexapro was improving Richardson's symptoms of depression. (R. 389-90). Richardson continued to go to Morton on an approximate monthly basis through 2008 for medication refills and check-ups. (R. 240, 372-74, 383-88).

On May 17, 2008, Richardson presented to the Hillcrest emergency room for complaints of shortness of breath, dizziness, and chest pain that apparently started during a fight with her spouse. (R. 178, 186-91). The doctor noted that Richardson was positive for alcohol use and that she had a 250 mg/dl blood alcohol concentration. (R. 186-87, 219). She was later discharged with resolve of her chest pain. (R. 187).

On June 30, 2008, Richardson presented to Family & Children Services ("FCS") for assistance in controlling her violent behavior. (R. 397-400). The records reflect that Richardson was poorly groomed, confused, and had a sad affect. (R. 399). Richardson reported that she

experienced sadness, loss of interest, decreased appetite, and decreased sleep. *Id.* She

continually felt nervous and jittery. *Id.* Richardson said that her problems began as a child. *Id.*

She reported that her violent behavior had increased over the years. *Id.* Richardson reported

that she had lengthy blackouts twice a week where she could not remember anything. *Id.*

Richardson claimed that she had stabbed her boyfriend on many occasions during her blackouts.

*Id.* In explaining her actions, the records reflect Richardson stated:

> I don't know why I do it and I don't want to hurt anyone. I don't remember any
> of it. . . I never have a plan. It just happens and then bam and I've said or done
> something to someone. . . I have weird messed up thoughts about people I don't
> know and it is like a dream but I am awake. . .

*Id.* Richardson gave an example of being in a dream state where she was convinced that she had

killed a lady in her bathtub during a blackout, only to discover that no one was there. *Id.*

After completion of the FCS intake evaluation, Richardson met with Sarah Janes, D.O.

(R. 401-02). Richardson told Dr. Janes that her depression began after her husband went to

prison, 15 years earlier. (R. 401). In addition to complaints of blackouts and violent mood

swings, Richardson told Dr. Janes that she experienced interrupted sleep, irritability, poor

concentration, increased energy, poor impulse control, anxiety and nervousness. *Id.* She said

her appetite was poor and that she had not eaten in three days. *Id.* Dr. Jane diagnosed

Richardson with bipolar disorder; anxiety; and alcohol dependency, in full sustained remission.

*Id.* Dr. Janes refilled Richardson's prescription for Lexapro, increased the dosage of Depakote,[6]

and prescribed Hydroxyzine Pamoate for anxiety and insomnia. (R. 396, 402, 416-17).

When Richardson was seen for a follow-up appointment at FCS on July 22, 2008, the

clinician noted that Richardson maintained a pleasant mood and affect, and that her grooming

---

[6] Depakote is used in the treatment of manic episodes associated with bipolar disorder.
Dorland's at 477, 536.

and hygiene were appropriate. (R. 412-13). She displayed "slightly pressured" speech. (R. 412). Richardson reported that she had only lost her temper once that week, advising that her medications were helping her symptoms. *Id.* It was noted that Richardson was supposed to begin an anger management group the following week. *Id.*

Richardson saw a registered nurse at FCS for medication review on September 2, 2008. (R. 414). Richardson reported a decrease in her appetite, sleep, and energy. *Id.* She also complained of still having violent behavior. *Id.* Richardson rated her depression at 7 on a scale of 1-10. *Id.* The nurse noted that Richardson acted calm and neutral, and that she had a euthymic mood and broad affect. *Id.* Richardson was given a refill of her medications, and was directed to make an appointment with her doctor to discuss dosage changes. (R. 414, 416).

Richardson presented for pharmacological management with Maria Arquisola, M.D. at FCS on October 8, 2008. (R. 415). She told Dr. Arquisola that she had experienced mood swings, irritability, and angry outbursts. *Id.* She reported that she had been acting out her dreams and hitting her boyfriend. *Id.* She denied any suicidal or homicidal ideation. *Id.* Dr. Arquisola noted that Richardson was loud, but calm and cooperative. *Id.* She was well groomed and had adequate hygiene. *Id.* Dr. Arquisola increased the dosage of Depakote, and refilled her other prescriptions. *Id.*

On September 8, 2008, agency consultant Michael D. Morgan, Psy.D., conducted a psychological examination of Richardson. (R. 322-26). Richardson told Dr. Morgan that she was unable to work due to her bipolar disorder, chronic back and hip pain, and headaches. (R. 322-23). Richardson reported feeling fatigued, difficulty sleeping, reduced interest in activities, and having low motivation. (R. 323). Dr. Morgan noted that she did not report any episodes of decompensation. *Id.* Richardson reported to Dr. Morgan that she was in a fight with a previous employer in which she "beat him up." (R. 322). Dr. Morgan also noted that she had received a

deferred sentence for assault and battery with a dangerous weapon in 2006. (R. 324).

In evaluating Richardson's mental status, Dr. Morgan indicated Richardson had signs and symptoms consistent with a depressive disorder not otherwise specified, including dysphoria,[7] weight loss, fatigue, and sleep disturbance. *Id*. Dr. Morgan further opined that Richardson's depressive disorder was "likely related to her chronic pain issues [and] [w]ith appropriate treatment she may show some improvement but her depressive symptoms are not likely to fully remit until her chronic pain is resolved." (R. 325). Dr. Morgan found that she did not have signs and symptoms for a specific anxiety disorder or bipolar disorder. (R. 324). For "Diagnostic Impression," Dr. Morgan diagnosed Richardson with anxiety disorder, not otherwise specified, and alcohol dependency, with physiological dependence in sustained full remission. *Id*. He also assigned her a Global Assessment of Functioning ("GAF")[8] score of 56-60. *Id*.

Agency consultant Seth Nodine, M.D., conducted an examination of Richardson on September 16, 2008. (R. 335-42). Richardson weighed 244 pounds and her recorded blood pressure was 136/87. (R. 336). Dr. Nodine noted that Richardson was a difficult historian. (R. 335). Richardson reported that she was disabled because of her mood and her bipolar disorder. *Id.* She said that she was unable to interact with people. *Id*. Dr. Nodine noted that Richardson denied any physical reason that would prevent her from working, but upon further probing of her physical ailments, she mentioned the tumor on her right hand, stated that she could not stand for longer than half an hour and complained of pain in her lumbar back and hips that was made

---

[7] Dysphoria is defined as "disquiet; restlessness; malaise." Dorland's at 556.

[8] The GAF score represents Axis V of a Multiaxial Assessment system. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-36 (Text Revision 4th ed. 2000). A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 51-60 reflects "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning." *Id*. at 34.

worse by bending, stooping, and crawling.  *Id.*  She also reported weakness in her left arm that she said gave out after she held something for a period of time.  *Id.*  Richardson said that she had hypertension, which was controlled by medication.  *Id.*  Richardson reported intermittent chest pain and shortness of breath.  (R. 335, 342).  Dr. Nodine noted on the Chest Discomfort Form that stress possibly precipitated Richardson's chest pain and that the pain stopped on its own.  *Id.*  Richardson reported being free of chest pain for three weeks.  *Id.*

Dr. Nodine noted that the tumor on Richardson's third finger on her right hand was approximately 5.5 centimeters, but found that she had normal finger to thumb opposition and fine tactile manipulation.  (R. 336-37, 339-40).  Her grip strength was symmetric and normal 5/5.  *Id.*  He determined that Richardson was able to manipulate small objects and able to grasp tools such as a hammer.  (R. 340).  Dr. Nodine found that Richardson had full range of motion of all joints, but he noted that she had complaints of pain in her lumbar spine and bilateral hips even though she reported no pain or tenderness during the range of motion testing.  (R. 337-41).  Her straight leg raising was negative, her ability to walk on her heels and tiptoes was normal, and she ambulated at a normal and steady gait.  (R. 337, 341).

Dr. Nodine assessed Richardson with: diabetes, hypertension, bipolar disorder, alcohol dependency with three years of sobriety, transient ischemic attack ("TIA"),[9] dyslipidemia,[10] asthma, and a tumor on her finger.  (R. 337).  Also as part of her claim for disability, Richardson underwent pulmonary function testing on September 16, 2008.  (R. 328-33).  The results were within normal limits.  (R. 328).

---

[9] There is no other record of TIA in Richardson's medical records.  TIA is the temporary interference of the blood supply to the brain.  Taber's at 2024.

[10] Dyslipidemia is an abnormal amounts of lipids and lipoprotein in the blood.  Dorland's at 555.

Ron Smallwood, Ph.D., a nonexamining agency consultant, completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment on October 6, 2008. (R. 344-61). Dr. Smallwood noted Richardson had generalized anxiety disorder, not otherwise specified. (R. 348, 353). Dr. Smallwood also marked that Richardson had behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. (R. 348, 356). For the Paragraph B Criteria,[11] Dr. Smallwood found that Richardson had moderate restrictions of her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with insufficient evidence of decompensation. (R. 358). In the Consultant's Notes portion of the form, Dr. Smallwood noted that Richardson was a recovering alcoholic. (R. 360). He also noted that Richardson had no restrictions in her daily activities, other than having someone accompany her when she went out in public because she was afraid she might become violent. *Id.*

In his Mental Residual Functional Capacity Assessment, Dr. Smallwood found that Richardson was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. 344). He found Richardson to be markedly limited in her ability to interact appropriately with the general public. (R. 345). He found no other significant limitations. (R. 344-45). Dr. Smallwood wrote that Richardson could "perform simple tasks with routine supervision and no exposure to the general public." (R. 346). He noted that Richardson could

---

[11] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00©. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

relate to co-workers and supervisors on a superficial basis. *Id.* He further noted that she could adapt to a work situation with limited changes to her routine. *Id.*

Nonexamining agency consultant Luther Woodcock, M.D., filled out a Physical Residual Functional Capacity Assessment October 6, 2008. (R. 363-69). He indicated that Richardson could occasionally lift or carry 50 pounds, and that she could frequently lift or carry 25 pounds, and had no other pushing or pulling limitations. (R. 363). He indicated that Richardson had no postural or manipulative limitations. (R. 364-65). He checked spaces indicating that Richardson could sit, stand, or walk 6 hours in an 8-hour day. (R. 363). In the comments section, Dr. Woodcock identified that Richardson suffered from asthma, a heart condition, high blood pressure, a tumor on her right hand, arthritis, diabetes, irritable bowel syndrome, migraines, and mental health issues. (R. 363). He wrote that Richardson had full range of motion and denied chest pain for over three weeks. *Id.* He noted that Richardson was a recovering alcoholic, and that she used medications for her blood pressure, diabetes and asthma. *Id.*

Nonexamining agency consultant Laura Lochner, Ph.D., reviewed the record on December 10, 2008 and affirmed Dr. Smallwood's October 6, 2008 assessment. (R. 370). On December 16, 2008, nonexamining agency consultant Thurma Fiegel, M.D., reviewed the medical evidence in the record and affirmed Dr. Woodcock's October 6, 2008 assessment. (R. 395).

## Procedural History

Richardson filed an application on June 10, 2008, seeking supplemental security income benefits under Title XVI, 42 U.S.C. §§ 401 *et seq*. (R. 102-04). Richardson alleged the onset of her disability began on May 5, 2008. (R. 102). The application was administratively denied initially on October 6, 2008 and upon reconsideration on December 9, 2008. (R. 60-61). A hearing before ALJ Charles Headrick was held on December 2, 2009 in Tulsa, Oklahoma. (R.

35-59).  By decision dated January 22, 2010, the ALJ found that Richardson was not disabled.

(R. 11-21).  On June 9, 2011, the Appeals Council denied review of the ALJ's findings.  (R. 1-3).

Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this

appeal.  20 C.F.R. § 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[12]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

---

[12] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ made his decision at Step Five of the evaluation process. At Step One, the ALJ found that Richardson had not engaged in any substantial gainful activity since her application date of May 29, 2008. (R. 16). At Step Two, the ALJ found that Richardson had severe impairments of obesity and anxiety. *Id.* At Step Three, the ALJ found that Richardson's impairments, or combination of impairments, did not meet a Listing. (R. 17).

After reviewing the record, the ALJ determined Richardson had the RFC to perform sedentary to medium work with the following nonexertional limitations:

> [Richardson] can perform simple tasks with routine supervision and no exposure to the general public. [Richardson] can relate to supervisors and peers for work purposes on a superficial basis. [Richardson] can adapt to a work situation with limited changes in routine.

(R. 18). At Step Four, the ALJ found that Richardson was not capable of performing past

relevant work. (R. 20). At Step Five, the ALJ found that there were jobs in significant numbers in the economy that Richardson could perform, taking into account her age, education, work experience and RFC. (R. 20-21). Therefore, the ALJ found that Richardson was not disabled from May 29, 2008 through the date of his decision. (R. 21).

**Review**

Before discussing the merits of Richardson's appeal, the Court notes the requirements of a claimant in articulating her arguments before this Court. These requirements were discussed by the Tenth Circuit case of *Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009). In *Wall*, the court discussed an argument related to the claimant's RFC. *Id.* The Tenth Circuit noted that at the district court level, the claimant had merely alleged, several times, that the ALJ had failed to consider the objective medical evidence. *Id.* The appellate court cited to the opinion of the district court judge, stating that "[b]ecause Claimant's counsel failed to present any developed argumentation in regard to Claimant's physical impairments, the district court obviously viewed this issue as waived." *Id.* The Tenth Circuit called the claimant's argument at the district court "perfunctory," and said that it had deprived that court of the opportunity to analyze and rule on that issue. *Id.* (quotation and citation omitted). *See also Krauser v. Astrue*, 638 F.3d 1324, 1326 (10th Cir. 2011) (appellate review is limited to issues the claimant preserved and adequately presented on appeal).

With this as a framework, the undersigned acknowledges that Richardson has, at least in a perfunctory manner, raised issues regarding the ALJ's consideration of her mental impairments, including her bipolar disorder, consideration of the hand tumor, formulation of the ALJ's RFC determination, and in the hypothetical questions posed to the vocational expert. The Court finds that the ALJ's decision must be reversed because it did not sufficiently address the opinion evidence of record and failed to consider Richardson's obesity in formulating the RFC.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). The Regulations of the Social Security Administration require that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 416.927(d); *see also* SSR 96-5p, 1996 WL 374183 ("[O]pinions from any medical source about issues reserved to the Commissioner must never be ignored."). An ALJ must consider the opinion evidence and, if he rejects it, he must provide specific, legitimate reasons for the rejection. *Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. 2005) (unpublished) (*citing Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir. 2003)). If an ALJ's RFC determination conflicts with a medical opinion, then the ALJ must explain why the opinion was not adopted. *Ramirez v. Astrue*, 255 Fed. Appx. 327, 332-33 (10th Cir. 2007) (unpublished) (directing ALJ on remand to make specific findings explaining why he did not adopt opinions of consulting examiner); *Sitsler v. Barnhart*, 182 Fed. Appx. 819, 823 (10th Cir. 2006) (unpublished) (*citing* SSR 96-8p, 1996 WL 374184).

Even non-examining consultant opinion evidence must be considered and discussed. *Shubargo v. Barnhart,* 161 Fed. Appx. 748, 753-54 (10th Cir. 2005) (unpublished). In *Shubargo*, there were several non-examining opinions, and most of them said that the claimant could do light work, but one opinion said that the claimant could only do sedentary work. *Id.* In his RFC determination, the ALJ found that the claimant could do light work, but he did not explain why he rejected the nonexamining opinion that the claimant could only do sedentary work in favor of the other opinions. The Tenth Circuit found that the case had to be remanded to allow the ALJ to make this explanation. *Id. See also Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (ALJ's rejection of consulting examiner's opinion evidence by including some

restrictions and excluding others required explanation).

In this case, with the exception of finding that "little weight" should be given to the opinion of Batiste,[13] the ALJ did not explain in his decision the weight given to *any* of Richardson's treating sources or *any* of the examining or non-examining consultants. This is clearly in contradiction to the requirements set forth in the Regulations. 20 C.F.R. § 416.927. Because the ALJ failed to specify what weight, if any, was given to the various opinions in the record and failed to explain the reasons for assigning the weight, or rejecting the opinion, the Court "cannot simply presume the ALJ applied the correct legal standards." *Robinson,* 366 F.3d at 1083. The ALJ is required to make clear the weight given to medical opinions, and the Court "must remand because [it] cannot meaningfully review the ALJ's determination absent findings explaining the weight assigned." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). It is clear that the ALJ adopted Dr. Smallwood's opinion of Richardson's mental RFC, even though he never specifically referenced it or discussed why he seemingly gave it controlling weight. (R. 18, 55, 346). Similarly, although the ALJ made no reference to or specified the weight given to Dr. Woodcock's opinion, it appears the ALJ also adopted his opinion of Richardson's physical RFC. (R. 16-20, 55, 363-69). The Court can only guess why the ALJ chose to give the opinions of these non-examining consultants more weight than other opinions in the record. Because the ALJ failed to follow the correct legal standards in evaluating and weighing the medical opinions of record, remand is necessary. *Robinson*, 366 F.3d at 1083; *Watkins*, 350 F.3d at 1300. On remand, the ALJ must consider and weigh all opinion evidence, including medical opinion evidence and other source opinion evidence as set forth in 20 C.F.R. §§ 404.1513, 416.927.

---

[13] Because reversal is required, the undersigned does not address the adequacy of the ALJ's discussion concerning the weight given to the opinions of Batiste.

Not only did the ALJ fail to weigh the medical opinions of record, he failed to discuss the evidence contained in those opinions that support Richardson's claim of disabling mental symptoms. It is oft-stated law in this circuit that an ALJ must discuss more than just the evidence favorable to an opinion that a claimant is not disabled:

> [I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). It is error to ignore evidence that would support a finding of disability while highlighting the evidence that favors a finding of nondisability. *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007). A bare conclusion, without discussion, is beyond meaningful judicial review, and therefore an ALJ is required to discuss the evidence and give reasons for the conclusions. *Clifton*, 79 F.3d at 1009.

In this case, the ALJ failed to discuss, or mentioned only in passing, Richardson's diagnoses of bipolar disorder by FCS and Dr. Nodine and her diagnosis of depressive disorder by Dr. Morgan. (R. 19, 324-25, 337, 344-61, 401). Dr. Morgan noted Richardson suffered from symptoms of dysphoria, fatigue, and sleep disturbance, which he opined were unlikely to resolve until her chronic pain was resolved. (R. 324-25). Dr. Janes described Richardson as also suffering from periods of "decreased need for sleep, irritability, poor conc[entration], increased energy and poor impulse control. . . [and] anxiety and problems with nervousness." (R. 401). Neither the ALJ nor Dr. Smallwood discussed this supportive medical evidence. (R. 17-19, 324-25, 337, 344-61, 401). The ALJ had a duty to discuss this medical evidence, including the information stated above, that tended to support Richardson's claim of disability. *Martinez v. Astrue*, 422 Fed. Appx. 719, 724-25 (10th Cir. 2011) (unpublished).

The undersigned is also concerned with the ALJ's finding that Richardson's morbid obesity was a severe impairment at Step Two but not referring to any limitations from her

obesity in his RFC determination.  In *Givens v. Astrue*, 251 Fed. Appx. 561, 566 (10th Cir. 2007) (unpublished), the ALJ found that the claimant's impairments at Step Two included depression, but he did not include any reference to mental limitations in his RFC determination.  The Tenth Circuit criticized the ALJ's treatment of the medical evidence relating to the claimant's mental issues, and the court specifically found that it was error to include the impairment at Step Two, but not to discuss the impairment in relation to his RFC determination or his analysis at Step Five.  *Id.* at 567-68.  In remanding the case, the Tenth Circuit said that the ALJ needed to "provide adequate reasons" if he rejected any significantly probative medical evidence in formulating the claimant's RFC.  *Id*. at 568.

While *Givens* is an unreported case, it is persuasive here in combination with the basic requirement noted above that the ALJ is required to discuss uncontroverted medical evidence that supports the claimant's assertions.  Contrary to the ALJ's statement that Richardson had little treatment for her musculoskeletal pain, there is ample evidence that Richardson complained of musculoskeletal pain on multiple occasions and was prescribed pain medication.  (R. 16-17, 181-82, 246, 264-65, 270-71, 273-74, 276-80, 284-85, 322-25, 335, 385).  The ALJ found Richardson's obesity was a severe impairment and he must give adequate consideration to the effect of Richardson's obesity upon her RFC.  *See Fleetwood v. Barnhart*, 211 Fed. Appx. 736, 741-42 (10th Cir. 2007) (unpublished) (ALJ must discuss what effect obesity, in combination with other impairments, would have on claimant's ability to work).  Dr. Woodcock's opinion, which appears to have been adopted by the ALJ, does not reference Richardson's obesity, complaints of pain, or any related functional assumptions.  (R. 363-69).  It is impermissible to "make assumptions about the severity or functional effects of obesity combined with other impairments [because] obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment." SSR 02-01p.  It is reversible

error for the ALJ to fail to explicitly consider the functional effects of obesity, a documented severe impairment, in formulating the RFC as outlined in SSR 02-01p.  *See DeWitt v. Astrue*, 381 Fed. Appx. 782, 785-86 (10th Cir. 2010) (unpublished).

Because the errors of the ALJ related to weighing medical opinions and consideration of Richardson's obesity require reversal, the undersigned does not address the remaining contentions of Richardson.  On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Richardson.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003) (*citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988)).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 31st day of August, 2012.

Paul J. Cleary
United States Magistrate Judge